## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

JOHN V. MEYER,                           )
                                         )
        **Plaintiff,**                   )
                                         )        **CIVIL ACTION**
v.                                       )
                                         )        **No. 12-1134-KHV**
UNUM LIFE INSURANCE                      )
COMPANY OF AMERICA, et al.,              )
                                         )
        **Defendants.**                  )
_____)

### MEMORANDUM AND ORDER

John V. Meyer brings suit against UNUM Life Insurance Company of America and UNUM Group (collectively "UNUM") for recovery of benefits under a long-term disability insurance policy governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq. This matter is before the Court on Plaintiff's Motion For Summary Judgment (Doc. #66) and Defendants' Motion For Summary Judgment (Doc. #67), both filed January 20, 2014. For reasons set forth below, the Court finds that plaintiff's motion should be sustained and that defendants' motion should be overruled.[1]

### Facts[2]

In reviewing Unum's decision, the Court relies on the following facts.

Niska Gas Storage, LLC ("Niska") operates the Salt Plains storage facility near Manchester,

---

[1]     On March 14, 2014, defendants filed a Motion For Leave To File Sur-Reply In Opposition To Plaintiff's Reply In Support Of Motion For Summary Judgment (Doc. #81). On August 14, 2014, defendants filed a Motion For Leave To File Notice Of Supplemental Authority (Doc. #88). In the interest of completeness, the Court sustains both motions.

[2]     In response to plaintiff's statement of facts, Unum includes legal citations and argument. The Court disregards all legal argument set forth in the fact section. See D.Kan. Rule 56.1.

Oklahoma.  Niska is the administrator and named fiduciary of the Niska Gas Storage, LLC Plan

("the Plan"), which is an employee welfare benefit plan under ERISA § 3(1), 29 U.S.C. § 1002(1).

On March 23, 2007, Unum issued Niska a group insurance policy to provide long-term disability

benefits to Niska employees under the Plan.  UA 108.[3]  Niska gave Unum discretionary authority

to make benefit determinations under the Plan.[4]

On October 15, 2008, John Meyer began working for Niska at the Salt Plains facility.  On

November 14, 2008, Meyer became a qualified participant with disability coverage under the Plan.[5]

On March 4, 2010, Meyer suffered an ischemic stroke.  Ischemic strokes are caused by

blockage of an artery to the brain; hemorrhagic strokes, in contrast, are caused by rupture of an

artery.  Ischemic strokes are caused by either an embolus, i.e., a clot that travels to the brain from

elsewhere in the body, or by a thrombus, i.e., a clot that forms in the artery.  See J.E. Schmidt, M.D.,

Attorneys' Dict. of Medicine (2010).  Four days after the stroke, Meyer had extra-cranial carotid

bypass surgery.  As a result of the stroke, he has speech difficulties and paralysis on one side of the

body.  UA 24.

---

[3]     "UA" citations refer to the administrative record in this case, which is contained in
Doc. #65-1.

[4]     The Plan provided as follows:

The Plan, acting through the Plan Administrator, delegates to Unum and its affiliate
Unum Group discretionary authority to make benefit determinations under the Plan.
. . .  Benefit determinations include determining eligibility for benefits and the
amount of any benefits, resolving factual disputes, and interpreting and enforcing the
provisions of the Plan.  All benefit determinations must be reasonable and based on
the terms of the Plan and the facts and circumstances of each claim.

UA 144.

[5]     Niska employees who began coverage after March 23, 2007 had a 30-day waiting
period for coverage under the Plan.

On August 1, 2010, Meyer submitted a claim for disability benefits under the Plan.

The Plan defines "disability" as follows:

You are disabled when Unum determines that: - you are **limited** from performing the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury** . . . .

* * *

SICKNESS means an illness or disease.

* * *

INJURY means a bodily injury that is the direct result of an accident not related to any other cause.

UA 119, 135, 137 (emphasis in original).  The Plan, however, excludes coverage for pre-existing conditions, i.e., "any disabilities caused by, contributed to by, or resulting from [a] - pre-existing condition."  UA 126.  The Plan defines "pre-existing condition" as follows:

You have a pre-existing condition if:

- you received medical treatment, consultation, care or services including diagnostic measures, or took prescribed drugs or medicines in the 6 months just prior to your effective date of coverage; and

- the disability begins in the first 24 months after your effective date of coverage unless you have been **treatment free** for 12 consecutive months after your effective date of coverage.

* * *

**TREATMENT FREE** means you have not received medical treatment, consultation, care or services including diagnostic measures, or taken prescribed drugs or medicines for the pre-existing condition.

UA 126-27, 136-37 (emphasis in original).

Unum assigned Ashley Forbes, a Unum Disability Benefits Specialist ("DBS"), to evaluate Meyer's claim.  On September 13, 2010, Forbes spoke with Meyer about his claim.  She told him that because his disability began within the first 24 months of coverage, she would review his claim for pre-existing conditions.  Forbes then sent a follow-up letter which asked Meyer to complete a supplemental claim form.  The letter explained that Unum would determine whether Meyer had

-3-

received treatment for his disabling condition during the six month "look-back" period before his coverage was effective, i.e., from May 13, 2008 to November 13, 2008.  UA 172.

Based on the exclusion for "pre-existing conditions," Forbes investigated whether Meyer: (1) had received treatment for a condition that "caused, contributed to, or resulted in" the disability during the six months before his effective date of coverage, November 14, 2008 ("the look-back period") and if so, (2) whether he was treatment-free for a period of 12 months before his claimed date of disability, March 5, 2010.  UA 437.

Medical records revealed that during the look-back period, (1) doctors had diagnosed Meyer with atrial fibrillation (UA 285-92, 387-90, 395, 401-03, 437); (2) Meyer had received numerous electrocardiograms related to atrial fibrillation (UA 285-292, 379-82, 437); and (3) doctors had prescribed medicines for anticoagulation (Coumadin), to prevent thrombus and embolus problems, cardiac rhythm control (Amiodarone) and blood pressure control (Betaxolol, Lisinopril, and Atenolol).  Doctors prescribed such medications continuously through Meyer's date of disability. UA 163-67, 192-93, 233, 315, 325, 398, 401-03, 423-25, 438.

On October 22, 2010, Forbes extended the time to decide the claim because Unum had not received copies of all medical records.  UA 221-23.  Several weeks later, on November 11, 2010, Forbes entered a note in the Unum claim file which stated "referred for triage review as Rx records rec'd and appears that claimant rec'd meds w/in LB [look-back] period that are pre-existing." UA 320.

On November 12, 2010, Forbes, Director Carolyn Brooks, Gary McCollum, R.N., and John Clancy, Vocational Rehabilitation Consultant, participated in a round-table review in which they briefly reviewed Meyer's records from the look-back period.  Three days later, on November 15, 2010, Forbes asked McCollum to review Meyer's file and answer the following questions:

-4-

-What medical treatment, consultation, care, services, or diagnostic measures did the claimant receive, or prescribed medicines did the claimant take for the pre-ex illness/injury?

-Did the claimant have symptoms of the claimed disabling illness/injury during the look[-]back period and, if so, what were they?

-*What is the medical relationship between the pre-ex illness/injury and the claimed disabling illness/injury? Please explain how and why this claimant's pre-ex illness/injury is a risk factor that led to the claimed disabling illness/injury.*

UA 324-25 (emphasis added).  These questions closely followed the Unum guidelines for reviewers seeking information regarding pre-existing conditions from clinical and/or medical experts.

On November 17, 2010, McCollum issued an opinion that Meyer had received treatment for atrial fibrillation and high blood pressure during the look-back period, and that those factors as well as obesity, hyperlipidemia and tobacco addiction increased his chance of a stroke.  UA 325-27.  Because the file did not contain all medical records for the period after the look-back, McCollum could not determine if Meyer had been continuously treated for atrial fibrillation and high blood pressure.[6]

On November 29, 2010, after obtaining additional medical records, Forbes referred the case back to McCollum.  UA 427.  On November 30, 2010,  Forbes, McCollum, Brooks and Vocational Rehabilitation Consultant Michael Stevens discussed the additional medical records at another round-table review.  The meeting notes stated that during the look-back period, Meyer had received treatment for conditions "likely of causing stroke."  The summary also stated that "[p]harmacy records in file show consistent use of medications noted in LB period throughout [treatment-free] period.  Therefore no 12 mth treatment[-free] period found."  UA 428.

---

[6]      On November 19, 2010, Forbes sent a letter to Meyer stating that she needed to extend the review period again because Unum was still waiting to receive medical records that it had requested from several sources.  UA 330-32.

On December 2, 2010, Forbes requested that Brooks review the Meyer file "for non-comp[ensable] due to pre-ex."  UA 431.  Forbes recited that Meyer had a number of conditions for which he was treated during the look-back period, all "known high risk factors for acute stroke."  <u>Id.</u>  (Meyer treated throughout look-back period for A-Fib, known condition with high likelihood of causing stroke).  Forbes thus made the initial determination to deny benefits.  On December 3, 2010, Brooks approved her decision**.**  <u>Id.</u>

On December 6, 2010, Forbes sent Meyer a letter explaining Unum's decision to deny benefits, stating in part as follows:

> In conclusion, our pre-existing evaluation determined that you were treated for dysrhythmia, atrial fibrillation, hypertension, anticoagulation and hyperlipidemia during the look[-]back period and did not have a period of 12 consecutive months treatment free.  The conditions that you were treated for are all known as high risk factors for an acute stroke.  These conditions either caused, contributed to, or resulted in the condition for [sic] disabling condition.  As a result, no benefits are payable for this medical condition and your claim has been closed.

UA 437.

> On May 20, 2011, Meyer appealed the denial of benefits, stating in part as follows:

> Your interpretation of the policy was that benefits were not payable due to a pre-existing condition.  You state that Mr. Meyer was treated for dysrhythmia, atrial fibrillation, hypertension, anticoagulation, and hyperlipidemia during the look[-]back period.

> It is our position, however, that these conditions or any of them are not the cause of his disability.

> On or about March 4, 2010, Mr. Meyer was treated for a cerebral artery ischemic stroke.  At no time was thrombosis identified.  The patient's medical records do not identify embolic stroke at all.  Further, Mr. Meyer had no prior history of a cerebral artery ischemic stroke.  Attached please find a letter from Dr. Andrew Massey, head of the neurology department at the University of Kansas Medical Center in Wichita.  Dr. Massey states that Mr. Meyer had no prior history of ischemic stroke prior to the stroke on March 4, 2010 that disabled him.  Further, in keeping with the [Plan's] definition of a "pre-existing condition," Mr. Meyer had never been treated for a

cerebral artery ischemic stroke.

UA 467-68.  Meyer attached a letter dated May 19, 2011 from neurologist, Dr. Andrew Massey

M.D., which stated in part as follows:

> As we discussed this afternoon, I did evaluate Mr. Meyer at Via Christi St. Francis Hospital on March 9, 2010 where he had been hospitalized March 5, 2010 for an acute stroke complicated by a right hemiparesis and dysphasia. Though he does have risk factors for an ischemic stroke, to my knowledge he had never been treated for a stroke prior to his hospitalization.
>
> I have reviewed the denial letter sent to Mr. Meyer and question why benefits should be excluded based on prior risk factors for ischemic stroke.  According to the recent guidelines from the American Heart Association and the American Stroke Association, risk factors for stroke may include: hypertension, tobacco use, diabetes mellitus, atrial fibrillation, carotid stenosis, dyslipidemia, sickle cell disease, post menopausal hormone therapy, poor diet, physical inactivity, obesity, body fat distribution, metabolic syndrome, alcohol, birth control pills, drug abuse, sleep disordered breathing, migraine, hyperhomocysteinemia, elevated lipoprotein(a), hypercoagulable states, chronic inflammation, infection, age, gender, ethnicity, genetic predisposition, and possibly birth weight.
>
> To say that someone being treated for a condition that is a risk factor for stroke (and risk factors for many other diseases besides stroke including heart disease) can be excluded from benefits based on a "pre-existing condition" seems to be too loose an interpretation of the meaning of "pre-existing condition."

UA 469 (internal citation omitted).

In offering his opinion, Massey did not describe his evaluation of Meyer and did not indicate whether he had reviewed any information other than Unum's denial letter.  Massey did not offer an opinion as to whether atrial fibrillation, high blood pressure or any other condition caused, contributed to or resulted in Meyer's stroke.  Massey did not provide his qualifications to offer an opinion on a heart/cardiac issue.  UA 469.[7]

---

[7]    During the initial claim review, Meyer did not identify Massey as a treating physician.

Unum assigned Jennifer Wellman, a Unum Lead Appeals Specialist, to evaluate Meyer's appeal. Wellman reviewed Meyer's claim file, which included all information submitted in support of Meyer's claim, as well as all information obtained and developed by Unum.

On May 26, 2011, Wellman entered a note on UNUM's computer system to schedule a round-table review of Meyer's appeal.[8]  UA 500-02.

On May 31, 2011, Appeals Quality Compliance Consultant Jane Carson led a third round-table of Meyer's claim with Wellman, Clinical Representative Laura Mininni and in-house cardiologist Dr. Costas Lambrew.[9]  The group recommended that Unum obtain additional medical records including ER records and ECG records from the second admitting hospital (Via Christi

---

[8]     Unum identified the following issues for medical review:

What medical treatment, consultation, care, services, or diagnostic measures did the claimant receive, or prescribed medicines did the claimant take for the pre-ex illness/injury during the period of 5/14/08-11/13/08?

*What is the medical relationship between the pre-ex illness/injury and the claimed disabling illness/injury?  Specifically, explain how and why this claimant's pre-ex illness/injury led to this claimant's claimed disabling illness/injury.  (Note: If the pre-ex illness/injury is a "risk factor" for the claimed disabling illness/injury, please explain in specific detail how and why each "risk factor" actually led to this claimant's claimed disabling illness/injury.)*

What medical conditions and/or symptoms did the claimant receive treatment for, if any, during the time period of 11/14/08 (EDOC) through 3/4/10?  Please indicate specific dates and corresponding conditions and/or symptoms treated.

UA 501 (emphasis added).

[9]     Lambrew has a contract to assist Unum in reviewing claimant's medical information. Lambrew is a fellow of the American College of Physicians and Master of the American College of Cardiology.  UA 691.  He practiced for over 50 years, most recently as Director of Cardiology at the Maine Medical Center in Portland, Maine.  Lambrew was a professor of medicine at the University of Vermont College of Medicine.  Lambrew has been retired from active practice of medicine since 2002.

Medical Center) before referring the case for a medical opinion from Lambrew.

Medical records from Via Christi Medical Center included Massey's evaluation of Meyer on March 9, 2010, shortly after his stroke. Massey noted that Meyer's past medical history was remarkable for atrial fibrillation and hypertension. UA 564. He also commented that after the stroke, Meyer had undergone tests which included a transthoracic echocardiogram that showed "mitral regurgitation, tricuspid regurgitation and increased left atrial size." Id. Under "Impression," Massey wrote, "Left middle cerebral artery ischemic stroke, status post extracranial-intracranial bypass, but also right frontal stroke suggesting the possibility of an embolic source . . . complicated by cerebral hemorrhage, edema and seizures." Id. He further explained:

> Would not anticoagulate for atrial fibrillation or if findings of a mural of left atrial clot until after basal ganglia hemorrhage has resolved. Would also hold any antiplatelet therapy for now until hemorrhage has disappeared. He could be treated by controlling risk factors including hyperlipidemia and optimize blood pressure control per neurosurgery to preserve patency of the extracranial-intracranial bypass.

UA 565. The discharge summary for Meyer's stay at Via Christi contains the following statements:

> 2-D echocardiogram was done to rule out embolic source of stroke….
>
> On 03/10/2010, transesophageal echocardiogram [TEE] was done in order to rule out any potential embolic source of stroke and no intracardiac mass or clot was seen as well as no vegetation.

UA 567.

On June 28, 2011, after receiving the additional medical information, Wellman summarized the state of the claim (including the initial denial because of a pre-existing condition and the contents of the record) and requested that Lambrew review and comment on the following

questions:[10]

> What medical treatment, consultation, care, services, or diagnostic measures did the claimant receive, or prescribed medicines did the claimant take for the pre-ex illness/injury during the period of 5/14/08 - 11/13/08?
>
> What is the medical relationship between the pre-ex illness/injury and the claimed disabling illness/injury?  Specifically, explain how and why this claimant's pre-ex illness/injury led to this claimant's claimed disabling illness/injury?  (Note: If the pre-ex illness/injury is a "risk factor" for the claimed disabling illness/injury, please explain in specific detail how and why each "risk factor" actually led to this claimant's claimed disabling illness/injury.)
>
> What medical conditions and/or symptoms did the claimant receive treatment for, if any, during the time period of 11/14/08 . . . through 3/4/10?  Please indicate specific dates and corresponding conditions and/or symptoms treated.

UA 687-88.[11]

On July 14, 2011, Lambrew issued his opinion and stated that in reaching his opinion, he had reviewed all medical records in the file.[12]  UA 688-91.

Lambrew noted that Meyer had a history of "recurrent or paroxysmal atrial fibrillation for which he was followed and treated for at least 4 years prior to the ischemic stroke," including during

---

[10]     On July 1, 2011, Wellman wrote Meyer's counsel to inform him that Unum would take additional time to decide the appeal because it had just received medical information related to the appeal.

[11]     The referral question came from a Unum Job Aid entitled "Pre-Existing Evaluation Questions for Clinical/Medical Resources."

[12]     Plaintiff contests whether Lambrew actually reviewed all medical information, asserting that he missed some important information.  For example, Lambrew wrote that Meyer's attending physician, Dr. Blunk, had imposed no restrictions or limitations on Meyer after the stroke.  UA 690.  "A[ttending] P[hysician] Restrictions and Limitations: None."  Blunk, however, advised Meyer to stop working and indicated that Meyer's post-stroke symptoms included right hemiplegia and dysarthria (motor speech disorder) and that Meyer could not engage in fine finger movements with his dominant hand, could not engage in hand/eye coordinated movements with his right hand, could not push or pull with his right hand, or lift any amount of weight, climb, twist/bend/stoop or operate heavy machinery.  Blunk also noted that Meyer could only stand or walk occasionally (1-33% of the time).  UA 52-54.

the look-back period.  UA 689.  Lambrew opined that "[t]he pre-existing condition of atrial

fibrillation, based on the medical evidence, was the primary cause of the claimant's embolic,

ischemic stroke on 3/5/10."  UA 690.  Lambrew explained his reasoning as follows:

> It is well-known that patients in chronic persistent AF [atrial fibrillation] or
> paroxysmal AF are at an increased risk of stroke. . . .  The increased risk is related
> to the fact that during AF, atrial contraction is disorganized and not synchronous in
> moving blood to the left ventricle, with resultant stasis which promotes clotting of
> blood. Echocardiogram in Mr. Meyer documented that the LA [left atrium] was
> increased in size to 4.4 on one determination and 4.5 in another.  LA enlargement
> further results in stasis and increases the propensity for clot formation. It has also
> been noted that embolization of the clot that has formed in the left atrium may
> frequently occur when the patient converts from NSR [normal sinus rhythm] to AF,
> or converts spontaneously or by cardioversion or with drugs from AF to NSR.  The
> evidence records that Mr. Meyer had paroxysmal AF, and would go in and out of the
> rhythm over the years, as well as periods of persistent AF.  This is documented in
> the history, as well the observations during the hospital admission from 3/5/10 to
> 3/16/10.  The risk was recognized by Drs. Blunk and Reader, since he was
> anticoagulated during the look-back period, and prior to the stroke, to prevent a
> CVA [cerebrovascular accident] or embolization to another organ.  While the TEE
> [transesophageal echocardiography] did not find evidence of a thrombus in the [left
> atrium] after the stroke, it is not unusual to find no residual clot after embolization.
> Emboli tend to lodge at a branch point in the arteries of the brain, and it is of interest
> that in Mr. Meyer, it occluded the left middle cerebral artery at the trifurcation point.
> Hypertension also contributed to his risk of acute CVA, as an independent predictor
> of ischemic stroke, and it should be noted that his BP on admission was 163/95.
>
> The absence of significant atheromatous involvement of the internal and external
> carotids on both sides, by Doppler evaluation, and absence of any evidence of
> coronary disease given the negative stress perfusion imaging study done on 6/6/09,
> would not favor an etiology of primary thrombosis of atheromatous cerebral vessels.

UA 690-91 (internal citations omitted).  Lambrew opined that "[w]ith a reasonable degree of

medical certainty, the medical evidence, therefore, supports the conclusion that the claimant had an

ischemic stroke that was caused by an embolus from the LA [left atrium] that formed as a result of

AF [atrial fibrillation].  AF was present before and during the look-back period."  UA 691.

Lambrew also stated that Meyer was treated for atrial fibrillation and hypertension during the look

back period, "to prevent embolization and possible ischemic stroke."  UA 690.

On July 15, 2011, Unum notified Meyer that it had denied his appeal.  Unum stated that according to Lambrew, the primary cause of the stroke was Meyer's pre-existing atrial fibrillation, for which he received treatment during the look-back period and continuously thereafter.  UA 696-701.  Unum stated that it upheld the benefit denial because the stroke was "caused by, contributed to by, or resulted from" pre-existing conditions," i.e., atrial fibrillation and hypertension.  UA 698-99.

<u>Facts Relating To Unum Claim Practices And Inherent Conflict Of Interest</u>

The Unum Appeals Unit is separate and independent from the Benefits Center.  The units are located on different floors and have separate management structures and personnel, including medical and vocational resources.

The Benefits Center disability benefits specialists and the Appeals Unit specialists do not have any roles or responsibilities in managing or reporting, or other functions regarding Unum finances.  Wellman testified that Financial personnel do not advise or influence the Benefits Center or the Appeals Unit with respect to whether a claim is approved or denied – they have no involvement whatsoever in claim decisions.

Lambrew has worked for Unum on a part-time basis under a contract agreement over the past ten years.  Unum pays Lambrew $200 per hour.  From  2007 through 2012, Lambrew earned between $116,050 and $219,600 per year.  Lambrew works at the Unum offices in Portland, Maine, where he has a cubicle, a telephone and computer that are interrelated with Unum's company systems, and dictation transcription services.  Lambrew performs medical review services only for Unum and does not own a consulting business.

Lambrew has access to all information in the claim file including claim denial notes.  He testified that he does not decide whether to grant or deny claims, but merely issues medical opinions based on information provided.  Unum does not base his compensation on the results of his opinions, whether he decides for or against the claims.  Lambrew testified that he feels free to give an opinion that someone is disabled, and that he has an ethical responsibility to give the correct opinion regardless of the outcome.

### Analysis

Plaintiff asserts that he is entitled to summary judgment because Unum's denial of benefits was arbitrary and capricious.  Unum asserts that it is entitled to summary judgment because substantial evidence supports its decision.  The parties appear to agree that the core of the dispute is whether Unum abused its discretionary authority to determine eligibility for benefits, including the discretion to resolve factual disputes and to interpret Plan provisions, in denying plaintiff's claim for disability benefits because his disability was "caused by, contributed to by, or resulting from a pre-existing condition."  Before addressing this issue, the Court must determine the appropriate standard for reviewing Unum's decision.

I.      Standard Of Review

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535,

1538-39 (10th Cir. 1993).[13]   This Court has acknowledged, however, that summary judgment standards are not completely suited to the Court's review of the administrative record in an ERISA action.  See McNeal v. Frontier AG, Inc., 998 F. Supp.2d 1037, 1040-41 (D. Kan. 2014); Baker v. Tomkins Indus., Inc., 339 F. Supp.2d 1177, 1181 (D. Kan. 2004).  Here, the parties do not ask the Court to determine whether material issues of fact remain for trial; they seek review of an administrative record to determine whether Unum reasonably denied plaintiff's claim.  See McNeal, 998 F. Supp.2d at 1040.  The Court's task is to act "as an appellate court and evaluate[ ] the reasonableness of a plan administrator or fiduciary's decision based on the evidence contained in the administrative record."  Id. (citing, inter alia, Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1579 & n.31 (10th Cir. 1994)).

A district court reviews denial of ERISA benefits under a de novo standard "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan, 605 F.3d 789, 796 (10th Cir. 2010) (quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)).  If, as here, the plan administrator has discretion to determine eligibility for benefits and to construe plan terms, then the court reviews the administrator's actions under a "deferential standard of review."  Metro. Life Ins. Co. v. Glenn,

---

[13]     Where the parties file cross-motions for summary judgment, the Court is entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts. James Barlow Family Ltd. P'ship v. David M. Munson, Inc., 132 F.3d 1316, 1319 (10th Cir. 1997).  The Court considers cross-motions separately: the denial of one does not require the grant of the other.  US Airways, Inc. v. O'Donnell, 627 F.3d 1318, 1324 (10th Cir. 2010).  To the extent that cross-motions overlap, however, the Court may address the legal arguments together.  Berges v. Std. Ins. Co., 704 F. Supp.2d 1149, 1155 (D. Kan. 2010).  The material facts are undisputed in this case, and both motions present the same legal issues.  The Court therefore addresses those issues together.

554 U.S. 105, 111 (2008) (quoting Firestone, 489 U.S. at 111).  Under this standard, a court reviews the administrator's decision for abuse of discretion.  See Foster v. PPG Indus., Inc., 693 F.3d 1226, 1231 (10th Cir. 2012).

The Tenth Circuit "treats the abuse-of-discretion standard and the arbitrary-and-capricious standard as 'interchangeable in this context,' and 'applies an arbitrary and capricious standard to a plan administrator's actions.'"  Id. at 1231-32 (quoting Fought v. UNUM Life Ins. Co. of Am., 379 F.3d 997, 1003 & n.2 (10th Cir. 2004) (per curiam), abrogated on other grounds by Glenn, 554 U.S. at 118).  Here, the parties do not dispute that the Plan grants the Plan Administrator discretion to determine eligibility for benefits, including resolving factual disputes and interpreting and enforcing Plan provisions, within the parameters that "all benefit determinations must be reasonable and based on the terms of the Plan and the facts and circumstances of each claim."  The Court therefore evaluates Unum's decision that plaintiff is not entitled to disability payments under an arbitrary and capricious standard of review.

The review under the arbitrary and capricious standard "is limited to determining whether the interpretation of the plan was reasonable and made in good faith."  LaAsmar, 605 F.3d at 796.  The decision need not be the only logical one or even the best one.  It need only be sufficiently supported by facts within the administrator's knowledge to counter a claim that it was arbitrary or capricious.  Kimber v. Thiokol Corp., 196 F.3d 1092, 1098 (10th Cir. 1999) (citing Woolsey v. Marion Labs., Inc., 934 F.2d 1452, 1460 (10th Cir. 1991)) (court should uphold decision unless not grounded on any reasonable basis).  The reviewing court need only assure that the administrator's decision falls somewhere on a continuum of reasonableness – even if on the low end.  Id. (quoting Vega v. Nat'l Life Ins. Serv., Inc., 188 F.3d 287, 297 (5th Cir. 1999), overruled on other grounds

by Glenn, 554 U.S. at 118) (rejecting "sliding scale" approach to deferential review where benefits plan administrator is operating under a conflict of interest).

The Court's review under the arbitrary and capricious standard is influenced, however, by the inherent conflict of interest when, as here, the claims administrator acts in a dual role as evaluator and payor of the claim. Glenn, 554 U.S. at 112. The Court must weigh the conflict of interest as a factor in the abuse of discretion analysis, weighing it "more or less heavily depending on the seriousness of the conflict." Murphy v. Deloitte & Touche Grp. Ins. Plan, 619 F.3d 1151, 1157 n.1 (10th Cir. 2010). The Court applies "a combination-of-factors" method of review that allows it to take account of several different factors, often case-specific, in reaching a result. Holcomb v. Unum Life Ins. Co., 578 F.3d 1187, 1193 (10th Cir. 2009) (internal quotation marks and alterations omitted) (citing Glenn, 554 U.S. at 117). A conflict "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision . . . [and] should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy." Glenn, 554 U.S. at 117.

Plaintiff asserts that the record here requires the Court to attribute "great importance" to the inherent conflict of interest.[14] Specifically, plaintiff contends that Unum (1) has a history of biased claims administration, (2) did not take measures to reduce potential bias and (3) "blindly" relied on Lambrew's opinion, who (a) gave his opinion in response to standard leading questions by Unum, (b) was involved in round-table reviews designed to deny costly claims, (c) reviewed the entire

---

[14]    Plaintiff puts forth a litany of facts and arguments in support of its assertion that the conflict of interest here is of great importance. The Court has considered all of plaintiff's facts and arguments but addresses only those which require discussion.

claim file before issuing his opinion and (d) though termed a "consultant," is essentially a highly-paid Unum employee.

Plaintiff points to Unum's handling of another case in which Unum relied in part on Lambrew's opinion which connected treatment for risk factors with existence of underlying disease. See Ex. K. to Doc. #69, Memorandum in Lafferty v. Unum Life Ins. Co. of Am., No. 3:10-cv-02465, 2012 WL 667811 (M.D. Pa. Feb. 29, 2012) (opinion vacated July 11, 2012 and withdrawn from publication by the Court), see Order, Ex. M to Doc. #69. In Lafferty, the district court noted Lambrew's concession that plaintiff was not treated for heart failure during the look-back period and that treatment of coronary artery disease was done to *prevent* the development of heart failure. The Court in Lafferty did not address the policy language at issue here but found that plaintiff had not been treated for heart failure during the look-back period. After the district court entered its order in favor of plaintiff, the parties entered a settlement and requested that the court withdraw its opinon, which it did. See Ex. M to Doc. #69. Plaintiff criticizes Unum for asking the court to vacate the Lafferty opinon and not discussing with Lambrew the result in Lafferty, i.e. the district court's determination that prophylactic health care to treat risk factors during the look-back period is not the same as care for the disability itself. Lambrew took the same approach in both Lafferty and this case.

Courts have noted Unum's history of biased claims administration. See Glenn, 554 U.S. at 117; Stephan v. Unum Life Ins. Co. of. Am., 697 F.3d 917, 933-34 (9th Cir. 2012) (collecting cases that commented on Unum's history of erroneous and arbitrary benefits denials). Recently, however, Judge Julie Robinson of this Court noted that judicial criticism of Unum's history related primarily to claims practices which Unum employed from 1993-2003. See Swanson v. Unum Life Ins. Co.,

No. 13-CV-4107-JAR, 2015 WL 339313, at *8 (D. Kan. Jan. 26, 2015).  Courts have recognized that Unum has since changed its internal procedures, and Judge Robinson found that Unum's previous pattern of misconduct is "no longer present."  Id. at *8 & n.41 (numerous recent cases have found Unum's claims administration history is not factor, or is only minor factor, in reviewing Unum decisions to deny benefits).[15]  Judge Robinson placed limited weight on Unum's history because nearly a decade has elapsed since its "documented history of abusive practices."  Id. at *8.

Plaintiff contends that in this case, rather than take steps to reduce potential bias, Unum's procedures in handling Meyer's claim exacerbated the impact of the inherent conflict of interest. These practices include use of leading questions in medical referral questions, use of round-table reviews, and allowing appeals personnel to review the entire file (including claims notes).  Perhaps most importantly, plaintiff criticizes these practices in relation to Unum's reliance on the opinion of Lambrew, who (a) gave his opinion in response to standard leading questions by Unum, (b) was involved in round-table reviews designed to deny costly claims, (c) reviewed the entire claim file before issuing his opinion and (d) though termed a "consultant," is essentially a highly-paid Unum

---

[15]     Judge Robinson cited the following cases in concluding that Unum's recent claims practices do not merit higher scrutiny: Jones v. Unum Provident Corp., 596 F.3d 433, 438 (8th Cir. 2010); Rozek v. N.Y. Blood Ctr., 925 F.Supp.2d 315, 341 (E.D.N.Y. 2013); Mercado v. First Unum Life Ins. Co, No. 11 Civ. 4272, 2013 WL 633100, at *27 (Feb. 21, 2013); Taylor v. Unum Life Ins. Co. of Am., No. 11-CV-2602, U.S. Dist. LEXIS 7437, at *10 n. 2 (N.D. Tex. Feb. 20, 2013); Burton v. Unum Life Ins. Co. of Am., No. A-09-CA-532-SS, 2010 WL 2430767, at *11 (W.D. Tex. June 14, 2010); Uquillas v. Unum Life Ins. Co. of Am., No. CV 07-00542, 2010 WL 330255, at *17 (C.D. Cal. Jan. 21, 2010).  In response to UNUM's notice of supplemental authority, plaintiff points to two recent cases which criticize UNUM's claims practices.  See Doc. #89, n. 1, citing LaVertu v. UNUM Life Ins. Co. of Am., No. SACV 13-00332-JLS (ANX), 2014 WL 122473, at *13-15 (C.D. Cal. Mar. 25, 2014); Doe v. UNUM Life Ins. Co. of Am., No. 12-11413-RWZ, 2014,WL 3893096, at *6-11  (D. Mass. Aug. 8, 2014).  These two cases, however, do not establish current abusive claims practices.

employee.

Regarding round-table reviews, Unum asserts that it uses the reviews to assist disability benefits decision-makers in understanding medical aspects of claims. Cf. Merrick v. Paul Revere Life Ins. Co., 500 F.3d 1007, 1012 (9th Cir. 2007) (criticizing predecessor company's round-table practice, describing meetings with "lawyers, doctors, and claims handlers" in order to clear "most expensive claims" from books). Plaintiff has not demonstrated that Unum used the round-table reviews in this case to eliminate expensive claims.[16]

Plaintiff asserts that Unum posed leading questions to Lambrew, thus suggesting answers. As discussed in the analysis section below, the Court finds that leading questions may have contributed to possible bias in this case.

As to the fact that Unum gave appeals staff and Lambrew access to all files, Unum points out that the files contain information needed to complete a full evaluation. Medical information in the file may be helpful; however, shielding a physician from claims decisions would minimize risk of bias. See Prado v. Allied Domecq Spirits & Wine Group Disability Income Policy, 800 F. Supp.2d 1077, 1096-98 (N.D. Cal. 2011) (insurance company had opportunity to show that medical examiners were shielded from bias but chose not to do so). This practice adds to the potential for bias.

Finally, plaintiff points out that Lambrew receives substantial remuneration for his work at

---

[16]    The parties do not cite the amount of plaintiff's claim. See Pretrial Order (Doc. #63) at 7 (plaintiff seeks award of benefits and "respectfully suggests that the parties can stipulate to an amount if plaintiff prevails"). Although nothing in the record suggests that approval of plaintiff's claim would have had a significant economic impact on Unum, see Kimber v. Thiokol Corp., 196 F.3d 1092, 1098 (10th Cir. 1999), the Court cannot discount the possibility that the amount of plaintiff's claim contributed to potential bias.

Unum, and that Unum did not seek an independent opinion.  Unum counters that it does not compensate Lambrew based on his opinion, and that Lambrew testified that he feels ethically obligated to provide accurate opinions.  Nonetheless, whether a decisionmaker seeks an opinion from an independent expert is a factor to consider.  The fact that Unum did not seek an outside expert is entitled to considerable weight in the Court's review – especially in light of the Lafferty case.  As noted, in Lafferty, the United States District Court for the Middle District of Pennsylvania rejected Lambrew's effort to treat coronary artery disease (a risk factor) as a proxy for heart failure (a disabling event) for purposes of the pre-existing condition exclusion.  The fact that Unum did not counsel Lambrew about his error – and instead asked the district court to vacate its decision – suggests that Unum's commitment to independent impartial medical advice is more window dressing than substance.  This practice suggests actual bias and is entitled to some weight in the Court's review.

Unum cites measures which it has taken to reduce potential bias, including the fact that it operates the Benefits Center and Appeals Unit as physically separate units with different personnel. Appeals specialists do not discuss initial claims decision with employees from the Benefits Center. Unum does not pay decision makers based on claim quotas or targets.  Unum business units, including Finance, are completely separate from the Benefits Center and Appeals Unit, and Finance personnel are not involved with claim decisions. These steps reduce potential bias.  See Brown v. Hartford Life Ins., Co., 428 Fed. App'x 817, 821 (10th Cir. 2011) (separating initial claims handler from appeals specialist and separating financial department from claims department minimized conflict of interest).

Overall, the circumstances of this case suggest that the Court should weigh Unum's conflict

of interest heavily in reviewing whether Unum acted reasonably in denying plaintiff's claim.

Finally, the Court notes that plaintiff bears the burden to show by a preponderance of the evidence that he is disabled under the Plan.  See Thompson v. Union Sec. Ins. Co, 688 F. Supp.2d 1257, 1264 (D. Kan. 2010).  Plaintiff has met this burden.[17]  Unum bears the burden to show by a preponderance of the evidence that it reasonably applied the policy exclusion for pre-existing conditions, based on the terms of the Plan and the circumstances of Meyer's claim.  See Rasenack ex rel. Tribolet v. AIG Life Ins. Co., 585 F.3d 1311, 1319 (10th Cir. 2009) (under ERISA, insured has burden of showing that covered loss occurred, while insurer has burden to showing that loss falls within exclusionary clause of policy).  In ERISA cases, exclusionary clauses are interpreted narrowly.  See Frerking v. Blue Cross-Blue Shield of Kan., 760 F.Supp. 877, 881 (D. Kan. 1991).

II.    Application

The Court now turns to the specific issue at hand: whether Unum abused its discretion in denying Meyer's claim because his disability was "caused by, contributed to by, or resulting from" a "pre-existing condition" of atrial fibrillation and hypertension.  The case law analyzing pre-existing condition limitations in ERISA polices is "highly dependent on the individualized fact scenarios."  Goetz v. Greater Ga. Life Ins. Co., 649 F. Supp.2d 802, 818-19 (E.D. Tenn. 2009) (collecting cases).  The Court reviews Unum's decision in light of the Plan language and the entire

---

[17]    The record reveals no genuine issue of material fact in this regard.  In its statement of facts and argument, Unum refers to Meyer's *alleged* disability."  Meyer asserts that Unum has conceded that he is disabled under the Plan, pointing out that in the Pretrial Order, Unum referred to Meyer's "resulting disability" without qualification.  See Pretrial Order (Doc. #63) filed December 20, 2013, at 6. Further, under the Plan, the "pre[-]existing condition exclusion" presumes that the insured is disabled.  In ruling on the summary judgment motions, the Court finds that plaintiff has a disability defined by the Plan.  See Lafleur v. La. Health Serv. & Indem. Co., 563 F.3d 148, 155-56 (5th Cir. 2009) (administrator must give specific reason or reasons for denial at administrative level to provide parties opportunity for "meaningful dialogue").

administrative record to determine whether its decision was arbitrary and capricious, bearing in mind its inherent conflict of interest.

Plaintiff alleges that he became disabled on March 5, 2010 when he suffered an ischemic stroke that made him unable to perform his job.  As noted, the Plan excludes benefits for disabilities "caused by, contributed to by, or resulting from" a pre-existing condition.  The Plan defines "pre-existing condition" by stating that a pre-existing condition exists when claimant

> received medical treatment, consultation, care or service including diagnostic measures, or took prescribed drugs or medicines in the 6 months just prior to your effective date of coverage; and - the disability begins in the first 24 months after your effective date of coverage unless you have been treatment free for 12 consecutive months after your effective date of coverage.

Plaintiff's effective date of coverage was November 14, 2008.  Thus, under the Plan, any condition for which plaintiff received treatment during the six-month look-back period before that date was pre-existing, unless he was treatment-free for a 12-month period after the effective date of coverage, which he was not.[18]  Therefore, the dispositive issue is whether plaintiff received medical treatment, consultation, care, service or diagnostic measures, or took prescribed drugs or medicines for an ischemic stroke during the six months prior to November 14, 2008.  If so, the Court must address the entirely separate question whether the pre-existing condition, as defined by the policy, "caused," "contributed to" or "resulted in" plaintiff's disability.  If not, the analysis is at an end; absent a pre-existing condition, as defined in the policy, Unum cannot satisfy its burden of proof on the policy exclusion.

---

[18]     Unum reviewed medical records and determined that benefits were not payable because plaintiff's disability was "caused by, contributed to by, or resulting from" the "pre-existing condition" of atrial fibrillation.  Medical records showed that plaintiff was not treatment-free for atrial fibrillation for any 12 consecutive months after November 14, 2008, his effective date of coverage.

Here, Unum abused its discretion in finding that plaintiff had pre-existing conditions as defined by the policy.  During the look-back period, plaintiff undeniably had atrial fibrillation and took prescription drugs for anticoagulation, cardiac rhythm control and high blood pressure.  No one claims that during that  period, plaintiff had a prior stroke or received  care, treatment, diagnoses or medicines on account of a prior stroke.

Unum's decision that plaintiff was not entitled to benefits because his disability was "caused by," "contributed to by" or "resulted from" pre-existing conditions of atrial fibrillation and high blood pressure was arbitrary and capricious in three respects: (1) Lambrew's opinion was not consistent with independent contemporaneous medical records and other independent evidence and (2) Unum adopted Lambrew's opinion wholesale without an independent examination; and (3) Unum did not reasonably interpret and apply the policy exclusion for pre-existing conditions – which must be construed narrowly.  More specifically, Unum acted arbitrarily and capriciously in disregarding the plan's express definition of what constitutes a "pre-existing condition" and jumping instead to an entirely different question – causation.

A.     Lambrew's Opinion

As noted, Lambrew opined that atrial fibrillation and hypertension caused the stroke,[19] i.e. that because atrial fibrillation and hypertension are risk factors for ischemic strokes, plaintiff had

---

[19]     Lambrew determined that "[w]ith a reasonable degree of medical certainty, the medical evidence, therefore, supports the conclusion that the claimant had an ischemic stroke that was caused by an embolus from the LA [left atrium] that formed as a result of AF [atrial fibrillation]."  UA 691.  Lambrew also stated that during the look back period, Meyer was treated for atrial fibrillation and hypertension "to prevent embolization and possible ischemic stroke."  UA 690.

a pre-existing condition under the policy.[20]   Atrial fibrillation and hypertension are not the

precipitating causes, however, of ischemic strokes; such strokes are caused by either (1) an embolus

(a clot that travels to the brain from elsewhere in the body); or (2) a thrombus (a clot that forms in

an artery).   Lambrew explained that plaintiff had an enlarged left atrium, which increases the

"propensity" for clotting and that embolization "may frequently occur" in such circumstances.

Independent contemporaneous medical records and tests, however, seem to have ruled out an

embolus.   Specifically, Massey's records noted that two separate tests (a 2-D echocardiogram and

a transesophageal echocardiogram) were performed to "rule out any potential embolic source of

stroke."   The tests revealed "no intracardiac mass or clot" and plaintiff was discharged "without any

further issues."   Lambrew noted this evidence but refused to accept it because it is not "unusual" to

find no residual clot after embolization.[21]   In other words, he implies that to rule out an embolic

source of plaintiff's stroke, his treating physicians used echocardiogram procedures which were

completely incapable of ruling out an embolic source.   Lambrew apparently rejects the test results

because it is "not unusual" for them to yield false negative results – even though in this case, the

record contains no evidence or scientific support for that opinion.   In addition, Lambrew reasons that

a false negative test result (no visual evidence of an embolus when one was actually present) is

---

[20]        Lambrew noted that atrial fibrillation increases the risk of stroke from 2.0 to 2.8 per
100.  Plaintiff points out the problem with relying on such risk factors, noting that "if 2 people out
of 100 will have a stroke anyway, it is twice as likely as not that [his] stroke was not related to risk
factors."

[21]        Plaintiff argues that the TEE test on March 10, 2010 "ruled out" an embolus, thus
completely contradicting Lambrew's opinion.  Although Lambrew stated that it is "not unusual" to
find no residual clot after embolization, Lambrew cited no authority for this statement.  In response,
Unum notes merely that Lambrew is an experienced cardiologist who has served as Director of
Cardiology at Maine Medical Center and professor of medicine at the University of Vermont
College of Medicine.

tantamount to a true positive result (an embolus was present, even if evidence is not available).[22]

B.    Independent Medical Exam

In light of the significant gap between Lambrew's opinion and the results of medical tests to rule out an embolic source of plaintiff's stroke, along with Lambrew's history in the Lafferty case, Unum did not act reasonably in relying on his opinion to deny benefits without an independent medical opinion.  Cf. Panther v. Synthes (USA) Employee Benefit Plan, 380 F. Supp.2d 1198, 1209 (D. Kan. 2005) (defendant abused discretion in discounting opinion of treating doctor without obtaining independent evaluation).

C.    Policy Interpretation

In applying Lambrew's opinion, Unum ignored the policy definition of pre-existing condition.  Unum denied benefits because plaintiff's *stroke* was "caused by, contributed to by, or resulted from . . . pre-existing condition[s]," i.e., atrial fibrillation and hypertension.  This conclusion is at odds with a plain reading of the policy exclusion.[23]  Under the policy, plaintiff is entitled to disability benefits if he is limited from working due to sickness or injury unless he had a pre-existing condition (*as defined in the policy*) which "caused," "contributed to" or "resulted in" his disability.[24]

---

[22]      In the final analysis for reasons stated below, Lambrew's opinion about the cause of plaintiff's stroke does not matter because Unum acted arbitrarily and capriciously in interpreting and applying the policy definition of "pre-existing condition" to his opinions.  Even if Lambrew is correct, Unum acted unreasonably in denying benefits.

[23]      Unum conflates the policy definition of pre-existing condition with the causation requirement, which only applies if the record shows a pre-existing condition.

[24]      The policy does not define these terms, and the parties have not addressed them in depth.

In Fought v. Unum, 379 F.3d 997, the Tenth Circuit addressed the same policy exclusion and applied the following definitions:

(continued...)

Here, the sickness or injury which prevents plaintiff from working is ischemic stroke, not atrial fibrillation or hypertension.[25]  Thus, plaintiff's *stroke* caused, contributed to or resulted in plaintiff's disability.  Unum has not produced evidence or even suggested that plaintiff was treated for stroke any time during the six-month look-back period or at any time during the 24-month waiting period. In finding that Meyer's disability was caused by, contributed to by, or resulted from a "pre-existing

---

[24](...continued)
"Cause" means "[t]o be the cause of," which is "[s]omething that produces an effect, result, or consequence."  "Contributed" is defined broadly as "[t]o act as a determining factor."  "Results" means "to happen or exist as a result of a cause."

Id. at 1009 (disabling condition must be substantially or directly attributable to the pre-existing condition). Recognizing the primary issue as "a matter of where [to] draw the line on chains of causation," the Tenth Circuit rejected the insurer's contention that a mere but-for cause could satisfy the policy exclusion's causal nexus requirement.  Id.  The Tenth Circuit found that to accept the insurer's causation argument "would effectively render meaningless the notion of the pre-existing condition by distending the breadth of the exclusion."  Id. at 1009-10.

In Fought, plaintiff had pre-existing coronary artery disease which required angioplasty and then revasculization surgery after the effective date of coverage.  Due to a narrow sternum, plaintiff's surgical wound reopened and plaintiff developed an infection which required additional surgery and ultimately left her disabled.  Unum denied disability benefits because it found that the disability was "contributed to" by or "resulted from" plaintiff's pre-existing coronary artery disease. The Tenth Circuit overturned the denial of benefits.  Id. at 1010 (noting several intervening steps between coronary artery disease and disability; under pre-Glenn standard, shifting burden to insurer to establish that denial of benefits was not arbitrary and capricious).

Similarly, in Vander Pas v. Unum Life Insurance Company of America, 7 F. Supp. 2d 1011, 1018 (E. D. Wis. 1998), the court found that Unum abused its discretion in finding that use of Coumadin was a pre-existing condition which "caused," contributed to" or "resulted in" plaintiff's disability.  The court reasoned as follows:

The chain of causation appears more attenuated: The plaintiff's atrial fibrillation caused him to take Coumadin, which brought about his subdural hemotoma, which produced his disability.

Id. at 1018.

[25]    Throughout the look-back period, plaintiff worked with atrial fibrillation and hypertension and was not disabled.

condition," Unum was arbitrary and capricious because it ignored the policy definition of "pre-existing" and – treating risk factors as proxies for pre-existing conditions – jumped directly to the question of causation.

As noted, the Court must narrowly construe policy exclusions. If Unum wants to exclude coverage for pre-existing risk factors, it should do so unambiguously and not through a post-disability underwriting process in the claims department. With the benefit of hindsight, insurers may find it cheap and convenient to use risk factors as proxies for pre-existing conditions, especially in cases which involve chronic diseases and high-dollar claims.[26] Absent evidence of actual causation, however, the Court must reject any suggestion that treatment for a risk factor constitutes treatment for a pre-existing condition. Where expert testimony is necessary to establish a causal link, the party bearing the burden of proof may not prevail if the expert evidence consists of testimony expressed only in terms of risk factors or various possibilities. Cleary v. Knapp Shoes, Inc., 924 F. Supp. 309, 318 (D. Mass. 1996) (decision makers cannot conclude that hypertension caused plaintiff's stroke based on doctors' opinions that hypertension was risk factor for stroke); cf. Holsey v. Unum Life Ins. Co. of Am., 944 F. Supp. 573, 579 (E.D. Mich. 1996) (pre-existing condition of diabetes caused vision problems which were known complication of diabetes).

Risk factors are not proxies for pre-existing conditions under the language of this policy exclusion. In denying plaintiff's claim in the first instance, Unum had no evidence that plaintiff's atrial fibrillation or hypertension caused his stroke. On appeal, Unum relied on an opinion by Lambrew, a tainted, highly paid Unum contractor who rendered his opinion in response to leading

---

[26]     Based on the teachings of modern medicine, every human being is a walking, talking aggregation of risk factors (and also protective factors) for a host of maladies. Nearly everyone who is over a certain age and is treated by a primary care physician takes medication and makes life-style changes to mitigate all manner of risk factors.

questions and discounted physical test results.  In applying his opinion, Unum adopted an arbitrary and capricious interpretation of the policy definition of "pre-existing condition."  For all of the reasons set forth above, the Court finds that Unum abused its discretion in denying plaintiff's disability claim.

**IT IS THEREFORE ORDERED** that <u>Plaintiff's Motion For Summary Judgment</u> (Doc. #66) filed January 20, 2104 be and hereby is **SUSTAINED.**

**IT IS FURTHER ORDERED that** <u>Defendants' Motion For Summary Judgment</u> (Doc. #67), filed January 20, 2014 be and hereby is **OVERRULED**.

**IT IS FURTHER ORDERED** that <u>Defendants' Motion For Leave To File Sur-Reply In Opposition To Plaintiff's Reply In Support Of Motion For Summary Judgment</u> (Doc. #81) filed March 14, 2014 be and hereby is **SUSTAINED**.

**IT IS FURTHER ORDERED** that <u>Defendants' Motion For Leave To File Notice Of Supplemental Authority</u> (Doc. #88) filed August 14, 2014 be and hereby is **SUSTAINED.**

Dated this 31st day of March, 2015 at Kansas City, Kansas.

<u>s/ Kathryn H. Vratil</u>
KATHRYN H. VRATIL
United States District Judge

-28-